**Opinion issued February 25, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-24-00708-CV**

———————————

## IN THE INTEREST OF A.N., A CHILD

———————————————————————————

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 121476-F**

———————————————————————————

## MEMORANDUM OPINION

The Department of Family and Protective Services ("DFPS") sought to terminate the parental rights of J.N. *a/k/a* J.R. ("Mother") to her minor daughter, A.N. ("Anna").[1] Following a bench trial, the trial court terminated Mother's parental

---

[1] In this opinion, we use pseudonyms for the minor child and her family members to protect their privacy. *See* TEX. R. APP. P. 9.8(b)(2).

rights to Anna based on two statutory predicate grounds. *See* TEX. FAM. CODE § 161.001(b)(1)(E), (O). The court further determined that termination of Mother's parental rights was in Anna's best interest. *See id.* § 161.001(b)(2).

Mother raises five issues on appeal. In her first two issues, she challenges the trial court's failure to dismiss the termination case against her after the court did not render a final order within 90 days after trial commenced. In her third issue, she argues that legally and factually insufficient evidence supports the trial court's finding that her parental rights should be terminated under subsection (O). And in her fourth and fifth issues, Mother argues that factually insufficient evidence supports the trial court's findings that her rights should be terminated under subsection (E) and that termination of her rights was in Anna's best interest.

We affirm.

## Background

### A.    DFPS Becomes Involved With Mother and Anna

Mother has five daughters, the oldest of whom is now an adult. Mother's four younger daughters are: J.B. ("Jade"), who was fifteen at the time of trial; G.R. ("Giselle"), who was ten; I.R. ("Iris"), who was six; and Anna, who was almost two. Giselle and Iris live with their paternal grandmother, the mother of Mother's late husband who passed away in 2021. Jade and Anna are both in the care of DFPS. Only Mother's parental rights to Anna are at issue in this proceeding.

DFPS was involved with Mother and her late husband in a couple of "open-and-shut cases" before it opened the still-pending case involving Jade. Mother's husband was not Jade's biological father, and "there were issues with him disciplining her." DFPS removed Jade from Mother's care due to "concerns about drug use and domestic violence." Specifically, DFPS had concerns about drug use by both Mother and her husband, and it had concerns about domestic violence "[b]etween the family." Jade has been under DFPS's managing conservatorship since 2020.

Mother gave birth to Anna in October 2022. She did not inform her caseworker in Jade's conservatorship case that she had had another child. DFPS received "an intake" concerning Mother and Anna in January 2023. At the time, Mother was living with her mother ("Grandmother"), and Anna was approximately three months old. Teresa Cruz, an investigator with DFPS, visited Mother and Anna. Cruz did not have any concerns about Anna or about Grandmother's house. Mother informed Cruz that while she was not using drugs, she had not been in recent contact with the caseworker for Jade's case. Cruz did not remove Anna from Mother's care following that visit.

On February 1, 2023, DFPS received a referral that Mother left Anna with a cousin and had not returned. Cruz visited Anna at the cousin's house and became concerned when she checked the cousin's criminal history and discovered that the

3

cousin had "a pending charge for smuggling persons." Anna was also sick and had a cold, but Mother's cousin was unable to take her to the doctor because she did not have her Medicaid card or any documentation stating that she was allowed to take Anna to the doctor. Cruz tried to find Mother at Grandmother's house, but Grandmother did not know where Mother was. Cruz texted Mother at a phone number that Mother had provided, but Mother did not respond.

DFPS filed its original petition seeking removal of Anna from Mother's care and temporary managing conservatorship on February 6, 2023. If reunification with Mother could not be achieved, DFPS sought termination of Mother's parental rights on several grounds. *See* TEX. FAM. CODE § 161.001(b)(1)(B), (C), (D), (E), (N), (O). On the same day that DFPS filed its petition, the trial court signed an order allowing the removal of Anna and naming DFPS as her temporary managing conservator. This ruling established the statutory dismissal date for the case: February 12, 2024. *See id.* § 263.401(a) ("Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing [DFPS] as temporary managing conservator, the court's jurisdiction over the suit . . . is terminated and the suit is automatically dismissed without a court order.").

DFPS created a family service plan for Mother. Among other obligations, the service plan required Mother to maintain safe and stable housing, obtain and

4

maintain income sufficient to meet Anna's basic needs, and allow DFPS access to her home. The service plan also required Mother to remain drug and alcohol free, submit to random drug testing, participate in a drug/alcohol assessment, and follow all recommendations from that assessment. Additionally, the service plan required Mother to complete parenting classes, participate in psychosocial and psychological evaluations, and follow all recommendations from the evaluations. The trial court adopted the service plan and made it an order of the court.

## B.    Scheduling Trial

The case was originally set for trial on February 8, 2024. However, the parties requested that the trial court extend the statutory dismissal date to conduct DNA testing of Anna and her alleged father N.E. ("Father"). Mother's counsel also argued that an extension was appropriate because Mother was in custody pending disposition of a motion to adjudicate guilt, and counsel hoped that Mother's criminal cases could be resolved before trial in the underlying proceeding. The trial court granted the request, extended the dismissal date to May 6, 2024, and reset the trial date to April 25, 2024. *See id.* § 263.401(b) (allowing extension of dismissal date if court finds that extraordinary circumstances necessitate DFPS remaining as child's temporary managing conservator and continuing that appointment is in child's best interest).

5

The trial court called the case for trial on April 25. Although DFPS had served Father with citation, he had not filed an answer, and he did not appear at trial. The court thus announced its intention to proceed by default with respect to Father. With respect to Mother, DFPS called Kristin Gooden, Anna's caseworker, as its first witness. Gooden briefly testified about her history with the case and the allegations that brought Mother and Anna to DFPS's attention. The trial court then recessed the case and stated that trial would resume on July 31, 2024. July 31 was 97 days after April 25. No party objected to resuming the trial on this date.

Mother was in state jail in Dayton when trial resumed on July 31. Although a request for a bench warrant had been submitted, the bench warrant was not executed, and she was not brought to trial. The trial court found that good cause existed to continue the trial setting "and have her bench warranted so she can be present unless she waives her presence at the trial." Several days later, the trial court issued a scheduling order that set October 2, 2024, as the date when trial would resume.

On August 19, 2024, Mother moved to dismiss the suit pursuant to Family Code section 263.4011. Mother argued that the court had failed to render a final order within 90 days of trial commencing on April 25, and the court had not held a hearing or considered evidence relevant to whether good cause existed to extend the 90-day period. Mother argued that the appropriate remedy for the trial court's failure to rule within 90 days was dismissal of the suit.

6

The trial court held a hearing on Mother's motion to dismiss on August 22, 2024. The court did not believe that section 263.4011 was jurisdictional or that dismissal of the suit was the appropriate remedy, pointing out that the statute itself allows a party to file a mandamus proceeding if the court fails to render a final order within the 90-day period. The court denied Mother's motion to dismiss and ordered trial to resume on August 29, 2024.

## C.  Trial Testimony

At trial, Mother strongly disputed the events that led to Anna's removal. According to Mother, she left Anna in the care of Grandmother because she needed to go to Houston to train for a job. At some point, Mother's cousin took Anna from Grandmother, and Anna was then removed from her cousin by DFPS. Mother denied that she "abandoned" Anna at her cousin's house. She testified that, instead, she did not learn that Anna had been at her cousin's house until after DFPS had already become involved with Anna.

Mother acknowledged that she had a history of abusing drugs, specifically methamphetamine. She did not characterize herself as a "continuous" or "habitual" user. However, she also testified that "[e]very time [she] did it, [she] got in trouble." Mother did not provide details about the extent of her criminal history, but she did testify that she had been incarcerated "two or three times" during Jade's conservatorship case. She also had been arrested for two possession of

7

methamphetamine offenses during the pendency of the underlying case involving Anna.[2] The trial court admitted results from a drug test of Mother's hair sample collected in December 2023 that revealed the presence of amphetamines, cocaine, and methamphetamine.

Except for approximately five months that she spent living with various family members and friends, Mother spent most of the pendency of the case in custody in either the Brazoria County Jail or state jail in Dayton. Mother was arrested in April 2023, and she was in custody in the Brazoria County Jail until July 2023, when the criminal court deferred adjudication of her guilt for two possession offenses and placed her on community supervision. Mother violated the terms of her community supervision by failing to report to her supervising officer and by committing a new possession offense in December 2023. Mother was in custody in the Brazoria County Jail until mid-June 2024, when she was transferred to state jail. Mother was in custody at the time of trial. She anticipated that her release date would be in mid-March 2025.

Mother acknowledged that she had a pattern of using methamphetamine and going to jail, but she testified that she had learned a lot about why she used drugs,

---

[2] In December 2022, before the underlying proceeding began, a grand jury charged Mother with a possession of methamphetamine offense that had allegedly occurred in February 2022. Mother pleaded guilty to this offense in June 2023, and the criminal court deferred adjudication of guilt and placed Mother on community supervision for three years.

8

and she intended to enter an inpatient rehabilitation program upon her release from state jail. Mother testified that she had completed a parenting class while incarcerated. Although she had not completed any of the other requirements of her service plan, she testified that she had applied for domestic violence classes, substance abuse recovery, mental-health classes, and PTSD counseling, and she was awaiting approval to begin those programs. Mother was able to speak with a counselor on two or three occasions while she was incarcerated.

The trial court also heard testimony from Anna's foster mother, who testified that Anna was "doing great," was "developmentally on track," and was "a very social and joyful toddler." Anna had no medical concerns. Anna was "very bonded" to her foster father, and she got along well with her six-year-old foster brother. Anna's foster family was interested in adopting her.

The trial court orally rendered judgment at the conclusion of trial on August 30, 2024. Several weeks later, the trial court signed a decree terminating Mother's parental rights to Anna. The court found, by clear and convincing evidence, that termination was warranted based on two statutory predicate grounds and that termination was in Anna's best interest.[3] *See* TEX. FAM. CODE § 161.001(b)(1)(E), (O), (b)(2). This appeal followed.

---

[3] Father did not file any responsive pleadings or otherwise participate at trial. The trial court adjudicated him as Anna's father and terminated his parental rights to

## Denial of Motion to Dismiss

In her first issue, Mother argues that the trial court abused its discretion by denying her motion to dismiss the suit under Family Code section 263.4011. In her second issue, she argues that the court abused its discretion by rendering a final order more than 90 days after trial had commenced. We address these issues together.

### A.     Governing Law

The Texas Family Code contains provisions designed to ensure that trial courts handle proceedings to terminate a parent's rights to her child expeditiously. *See In re G.X.H.*, 627 S.W.3d 288, 292 (Tex. 2021). Generally, unless the court has commenced the trial on the merits or granted an extension as allowed by statute, the court loses jurisdiction over the suit on the first Monday after the first anniversary of the date the court rendered a temporary order appointing DFPS as temporary managing conservator. TEX. FAM. CODE § 263.401(a); *In re G.X.H.*, 627 S.W.3d at 292. Dismissal of the suit is automatic and occurs without a court order. TEX. FAM. CODE § 263.401(a).

The trial court may grant an extension of the statutory dismissal date. *Id.* § 263.401(b). If the court finds that (1) extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of DFPS, and

Anna under subsections (E) and (O). *See* TEX. FAM. CODE § 161.001(b)(1)(E), (O), (b)(2). Father has not appealed the termination decree.

10

(2) continuing the appointment of DFPS as temporary managing conservator is in the child's best interest, the court may retain the suit on its docket for up to an additional 180 days. *Id.* If the court grants an extension but does not commence trial before the dismissal date, "the court's jurisdiction over the suit is terminated and the suit is automatically dismissed without a court order." *Id.* § 263.401(c).

Section 263.4011—at issue in this appeal—relates to the time period for a trial court to render a final order in a termination proceeding and provides:

(a)    On timely commencement of the trial on the merits under Section 263.401, the court shall render a final order not later than the 90th day after the date the trial commences.

(b)    The 90-day period for rendering a final order under Subsection (a) is not tolled for any recess during the trial.

(c)    The court may extend the 90-day period under Subsection (a) for the period the court determines necessary if, after a hearing, the court finds good cause for the extension. If the court grants a good cause extension under this subsection, the court shall render a written order specifying:

    (1)    the grounds on which the extension is granted; and

    (2)    the length of the extension.

(d)    A party may file a mandamus proceeding if the court fails to render a final order within the time required by this section.

*Id.* § 263.4011.

Several of our sister intermediate appellate courts have construed section 263.4011 and concluded that its requirement that the trial court render a final order within 90 days of commencement of trial is not jurisdictional. *See In re G.L.J.*, No.

11

05-23-01296-CV, 2024 WL 2513311, at *5–6 (Tex. App.—Dallas May 24, 2024, no pet.) (mem. op.); *see also D.D. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-24-00572-CV, 2024 WL 5081415, at *6 (Tex. App.—Austin Dec. 12, 2024, no pet.) (mem. op.) (following Dallas Court of Appeals' reasoning from *In re G.L.J.*); *In re O.S.*, No. 02-24-00295-CV, 2024 WL 4778360, at *5–7 (Tex. App.—Fort Worth Nov. 14, 2024, pet. denied) (mem. op.) (same); *In re T.D.*, No. 04-24-00185-CV, 2024 WL 4177965, at *7–8 (Tex. App.—San Antonio Sept. 13, 2024, no pet.) (mem. op.) (same).

In concluding that section 263.4011 is not jurisdictional, these courts have reasoned that the section does not include any statutory language "indicating a legislative intent to impose a limit on the trial court's jurisdiction." *See, e.g.*, *In re G.L.J.*, 2024 WL 2513311, at *5. Instead, the statute provides a mechanism for a party to challenge the trial court's failure to render a final order within 90 days: the party may file a mandamus proceeding. *Id.*; TEX. FAM. CODE § 263.4011(d). By including this mechanism, "the Legislature contemplated that a court of appeals may enter an order directing the trial court to issue the final order that the trial court failed to enter within the time limit prescribed by subsection (a)." *In re G.L.J.*, 2024 WL 2513311, at *6. "It would make no sense for an appellate court to compel a trial court to enter an order that the trial court has no jurisdiction to enter." *Id.* Including

12

subsection (d) is "clear evidence" the Legislature did not intend for the deadline in subsection (a) to be jurisdictional. *Id.*

## B. Analysis

The facts relevant to resolution of these issues are undisputed. Because the trial court first rendered a temporary order appointing DFPS as Anna's temporary managing conservator on February 6, 2023, the initial statutory dismissal date was February 12, 2024. *See* TEX. FAM. CODE § 263.401(a). At the parties' request, the trial court extended the dismissal date to May 6, 2024, and reset the trial date to April 25, 2024. The trial began on April 25, and the court briefly heard testimony from Anna's caseworker. The trial court then recessed the case and stated that trial would resume on July 31, 2024.[4] July 31 was 97 days after April 25. Ultimately, trial did not resume until August 29, 2024, and the trial court orally rendered judgment on August 30, 2024, 127 days after trial commenced.

Mother argues that the trial court abused its discretion by denying her motion to dismiss the suit under section 263.4011 and by rendering a final order after the 90-day deadline had passed. She further argues that section 263.401 establishes a deadline for rendition of a final order in termination suits: 180 days after expiration of the original statutory dismissal date if the dismissal date was properly extended.

---

[4] On appeal, Mother makes no argument that the April 25 proceedings do not constitute commencement of trial on the merits for purposes of Family Code section 263.401(a).

13

We agree with our sister courts that section 263.4011 is not jurisdictional. Unlike section 263.401(a), which contains express language stating that the trial court's jurisdiction over a suit is "terminated and the suit is automatically dismissed without a court order" if the trial on the merits has not commenced by the dismissal date or the court has not extended the dismissal date, section 263.4011 contains no such language. *Compare id.* § 263.401(a) *with id.* § 263.4011(a)–(d). Rather than providing that the trial court loses jurisdiction over the suit if it does not render a final order within 90 days of trial commencing, section 263.4011(d) details the remedy: "A party may file a mandamus proceeding if the court fails to render a final order within the time required by this section." *Id.* § 263.4011(d). We agree with the Dallas Court of Appeals that this explicit statutory remedy would make little sense if, upon expiration of 90 days following commencement of the trial, the trial court lost jurisdiction over the suit such that dismissal of the proceeding was required. *See In re G.L.J.*, 2024 WL 2513311, at *6; *see also In re J.S.*, 670 S.W.3d 591, 603 (Tex. 2023) ("We presume that statutory requirements are not jurisdictional absent clear contrary legislative intent.") (quotations omitted).

Because section 263.4011 is not jurisdictional, the trial court was not required to grant Mother's motion to dismiss after the 90-day deadline had passed. The appropriate remedy for Mother was to seek a writ of mandamus to compel the trial

14

court to render a final order, not to seek dismissal of the proceeding.[5] We therefore conclude that the court did not abuse its discretion by denying Mother's motion to dismiss.

Mother also argues that the trial court violated section 263.401 by rendering a final order more than 180 days after the original dismissal date of February 12, 2024. We do not agree that section 263.401 requires the trial court to render a final order within 180 days of the original dismissal date.

As stated above, a trial court loses jurisdiction over a termination proceeding on the first Monday after the first anniversary of the date the court rendered a temporary order naming DFPS as the child's temporary managing conservator unless the court has commenced trial on the merits or granted an extension as allowed by statute. *See* TEX. FAM. CODE § 263.401(a). Section 263.401(b) then provides:

> (b) Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child. If the court makes those findings, the court may retain the suit on the

---

[5] After the trial court ordered trial to resume on August 29, 2024, Mother filed a motion to stay the trial proceedings. In this motion, Mother indicated that she intended to file a petition for writ of mandamus. There is no indication in the appellate record or in the parties' briefing that Mother actually filed a mandamus proceeding.

court's docket for a period not to exceed 180 days after the time described by Subsection (a). If the court retains the suit on the court's docket, the court shall render an order in which the court:

(1)  *schedules the new date on which the suit will be automatically dismissed if the trial on the merits has not commenced, which date must be not later than the 180th day after the time described by Subsection (a)*;

(2)  makes further temporary orders for the safety and welfare of the child as necessary to avoid further delay in resolving the suit; and

(3)  sets the trial on the merits on a date not later than the date specified under Subdivision (1).

*Id.* § 263.401(b) (emphasis added). If the court grants an extension but does not commence trial on the merits before the new dismissal date, the court's jurisdiction terminates and the suit is automatically dismissed. *Id.* § 263.401(c). The court "may not grant an additional extension that extends the suit beyond the required date for dismissal under Subsection (b) . . . ." *Id.*

Mother interprets subsections (b) and (c) as requiring the trial court to render a final order within 180 days of the original dismissal date if the court extended the dismissal date. She argues that the court did not do so here because 180 days from the original dismissal date of February 12, 2024, was August 10, 2024, but the court did not render a final order until August 30, 2024.

We do not agree that section 263.401 requires the trial court to render a final order prior to the expiration of 180 days from the original dismissal date. Section

16

263.401 says nothing about the time for rendering a final order.[6] Instead, automatic dismissal under section 263.401 is tied to commencement of the trial on the merits. The trial court may extend the dismissal date up to 180 days after the original date, but if the court "does not commence the trial on the merits before the dismissal date," the court loses jurisdiction and the suit is automatically dismissed. *Id.* § 263.401(b), (c).

Here, the trial court extended the original dismissal date from February 12, 2024, to May 6, 2024. The court commenced the trial on the merits on April 25,

---

6    Mother cites *In re Texas Department of Family and Protective Services*, 210 S.W.3d 609, 612 (Tex. 2006) (orig. proceeding) (op. on reh'g), for the proposition that section 263.401 establishes a deadline for rendition of a final order in termination proceedings. At the time of the Texas Supreme Court's opinion in that case, section 263.401(a) provided as follows:

> Unless the court has rendered a final order or granted an extension under Subsection (b), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

Act of May 28, 1997, 75th Leg., R.S., ch. 600, § 17, 1997 Tex. Gen. Laws 2108, 2113 (codified at TEX. FAM. CODE § 263.401(a)). The Texas Legislature amended this section in the 2007 legislative session to delete the language about rendering a final order and to state that "[u]nless the court has commenced the trial on the merits" or granted an extension under subsection (b), the court shall dismiss the suit on the first Monday after the first anniversary of the date the court rendered a temporary order appointing DFPS as temporary managing conservator. Act of May 27, 2007, 80th Leg., R.S., ch. 866, § 2, 2007 Tex. Gen. Laws 1837, 1837 (codified at TEX. FAM. CODE § 263.401(a)). This same language is present in the version of the statute that applied to Mother.

17

2024, a date well within 180 days of the original dismissal date. This action satisfied section 263.401.

We hold that the trial court did not abuse its discretion by denying Mother's motion to dismiss and by rendering a final order more than 90 days after trial commenced.

We overrule Mother's first and second issues.

**Sufficiency of Evidence**

In her remaining three issues, Mother challenges the sufficiency of the evidence to support the trial court's judgment terminating her parental rights. Specifically, in her third issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination was warranted under subsection (O). In her fourth and fifth issues, Mother challenges the factual sufficiency of the evidence to support the trial court's findings that termination was warranted under subsection (E) and that termination of her parental rights was in Anna's best interest.

**A.       Standard of Review**

Parents have a fundamental right to make decisions concerning the care, custody, and control of their children. *In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023); *see Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (stating that parent's right to companionship, care, custody, and management of their children "is an interest far

18

more precious than any property right"). When DFPS seeks to terminate a parent's rights to her child, it must establish, by clear and convincing evidence, that (1) the parent committed one or more of the statutory predicate grounds justifying termination and (2) termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b); *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (stating that due process mandates clear and convincing standard of proof in parental termination cases). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

Due to the higher standard of proof required at trials for termination of parental rights, we apply a heightened standard of review on appeal. *In re N.G.*, 577 S.W.3d at 235; *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). In a legal sufficiency challenge, we must determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Giving deference to the factfinder, we look at all the evidence in the light most favorable to the finding, assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* (quoting *In*

*re J.F.C.*, 96 S.W.3d at 266). However, we may not disregard undisputed facts that do not support the finding. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). The factfinder is the sole judge of the witnesses' credibility and demeanor. *Id.*; *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021) (noting that heightened appellate standard of review "does not dispel . . . the deference that an appellate court must grant to the factfinder, who heard the witnesses and evaluated their credibility").

In a factual sufficiency review, we weigh disputed evidence contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We must consider whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of a finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that the finding was true. *In re A.B.*, 437 S.W.3d at 503 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

Even under this standard, we must "still provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *Id.* In a bench trial, the trial court as the factfinder weighs the evidence, assesses the credibility of witnesses, and resolves conflicts and inconsistencies in the evidence.

*In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (quotation omitted). We may not substitute our judgment for the factfinder's when considering the credibility of the evidence presented at trial. *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024) (quotation omitted).

To affirm a termination judgment on appeal, we need uphold only one predicate ground—in addition to upholding a challenged best interest finding—even if the trial court based termination on more than one predicate ground. *In re N.G.*, 577 S.W.3d at 232; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, termination of parental rights under subsections (D) and (E) can serve as the basis for termination of a parent's rights to another child in the future. *See* TEX. FAM. CODE § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d at 234. As a result, due process requires review of a trial court's findings under subsections (D) and (E) "even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child." *In re N.G.*, 577 S.W.3d at 235. Because Mother challenges the factual sufficiency of the evidence to support the trial court's finding under subsection (E), we turn to this issue first.

## B. Sufficiency of Evidence to Support Statutory Predicate Grounds

### 1. Governing Law on Endangerment Finding under Subsection (E)

A trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed

21

the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E).

"Endanger" means to expose a child to loss or injury or to jeopardize the child's physical or emotional well-being. *See In re J.W.*, 645 S.W.3d at 748; *In re J.F.-G.*, 627 S.W.3d at 312. Endangering conduct means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it does not require that the conduct be directed at the child or that the child suffer injury. *In re J.W.*, 645 S.W.3d at 748 (quotation omitted); *see In re R.R.A.*, 687 S.W.3d at 277 (noting that "ordinary meaning of endangerment" does not "require actual harm"); *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.— Houston [1st Dist.] 2010, pet. denied) (stating that danger to child "may be inferred from parental misconduct").

Termination of a parent's rights under subsection (E) requires more than a single act or omission by a parent; instead, "a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re D.L.W.W.*, 617 S.W.3d 64, 78 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quotation omitted). This conduct does not have to occur in the presence of the child. *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.). "[E]ndangering conduct may include the parent's actions before the child's birth, while the parent had custody of

22

older children, including evidence of drug usage." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

"Conduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *In re M.D.M.*, 579 S.W.3d at 765 (quoting *Jordan*, 325 S.W.3d at 723). A parent's use of illegal drugs and the effects of that usage on a parent's life and ability to parent may constitute an endangering course of conduct. *In re D.L.W.W.*, 617 S.W.3d at 78; *see In re N.J.H.*, 575 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (stating that parent's decision to engage in illegal drug use during pendency of termination suit, "when the parent is at risk of losing a child," may support finding that parent engaged in endangering course of conduct) (quotation omitted). "[E]ndangerment does not require a parent's drug use to directly harm the child." *In re R.R.A.*, 687 S.W.3d at 278. "Instead, a pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." *Id.*

Courts may also consider a parent's criminal history when determining if the parent has engaged in an endangering course of conduct. *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *see In re J.F.-G.*, 627 S.W.3d at 313 (stating that parent's criminal history can support endangerment finding, and court must consider nature of crimes, duration of incarceration, and "whether a pattern of escalating, repeated convictions exists"). "Routinely subjecting a child to

23

the probability that she will be left alone because her parent is in jail, endangers the child's physical and emotional well-being." *In re J.S.*, 584 S.W.3d at 635 (quotation omitted). Courts may consider criminal conduct that occurred prior to the birth of the child. *Id.* at 635–36.

### 2. Analysis

Mother argues that the evidence is factually insufficient to support the trial court's finding under subsection (E) because DFPS presented only one positive drug test from December 2023—ten months after DFPS removed Anna from Mother's care—and presented no evidence that Mother used drugs at or around the time of Anna's birth. She further argues that DFPS presented no evidence that she used drugs in Anna's presence or left Anna in the care of someone who uses drugs or in a place where drugs were present. Although Mother acknowledges that she was incarcerated at the time of trial, she argues that incarceration alone is not clear and convincing evidence of endangerment.

At trial, Mother agreed that her "drug of choice" was methamphetamine. Mother had also used marijuana during her teenage years, and she had been a "social" user of cocaine when she was in her twenties. Mother began using methamphetamine in her early thirties. She testified that she had never been a "continuous user of methamphetamine." She did not use methamphetamine every day, every other week, or even every month. She "would do it and stop," but then

24

"something would happen . . . and [she] would do it again." For example, Mother testified that she began using methamphetamine again in December 2023 after her living situation became unstable and she had to move in with a friend who was using. Mother testified that "[e]very time [she] did it, [she] got in trouble." She had never attended any kind of substance abuse program.

The trial court admitted results from a drug test conducted in December 2023,[7] during the pendency of the termination proceeding. Mother's urine sample did not reveal the presence of any drugs. Her hair sample, on the other hand, tested positive for the presence of amphetamines, cocaine, and methamphetamine. These were the only drug test results admitted at trial.

Mother was incarcerated for two periods during the pendency of the underlying proceeding. She was first incarcerated in the Brazoria County Jail from April through mid-July 2023 on a charge for criminal trespass and two charges of possession of methamphetamine. Mother pleaded guilty to all three offenses. With respect to the two possession offenses, the criminal court deferred adjudication of guilt and placed Mother on community supervision for three years.

---

[7] As part of her fourth issue, Mother briefly argues that the trial court's overruling of a hearsay objection that she made at trial to the December 2023 drug test results was an abuse of discretion because the results contained business records from two other laboratories in addition to the lab that conducted the testing. Even if Mother is correct that the trial court should have excluded this exhibit on hearsay grounds, we note that Mother admitted that she started using methamphetamine again in December 2023.

Mother was arrested in December 2023 for violating the terms of her community supervision. Mother testified that she failed to report to her community supervision officer. Additionally, she was arrested on a new charge for possession of methamphetamine.[8] She was then incarcerated at the Brazoria County Jail from December 2023 until mid-June 2024, when she was transferred to state jail in Dayton. Mother was still in custody at the state jail at the time of trial in August 2024. Her anticipated release date was March 15, 2025, and she intended to enter an inpatient recovery program upon her release. Mother agreed that her "constant incarceration and issues that [she has] with substance abuse has affected [her] children."

One of Mother's older daughters, Jade, was also in DFPS's care at the time of trial and had been since 2020. Mother estimated that during the pendency of that case, she was incarcerated two or three times. The trial court did not admit any further evidence concerning these prior criminal offenses. Mother testified that the case involving Jade began due to "concerns about drug use and domestic violence."[9]

---

[8] Mother was also arrested for forgery on the same date as the possession charge. The trial court admitted a copy of the complaint. In a discussion with the court, Mother's counsel and Mother represented that the forgery charge had been dismissed. The trial court stated that it would consider the forgery charge "to the extent that it provides any context to what was going on," but it was "not going to say that she's guilty of forgery and was even engaged in that offense."

[9] Mother also testified that she had "a couple" of CPS cases before the case involving Jade's conservatorship. Mother did not provide details about what these cases involved other than to say that they were "open-and-shut cases" in which her and

26

She testified that during that case, her husband unexpectedly passed away, she did not handle her grief well, she went to jail, and she allowed her former mother-in-law to have custody of two of her other minor daughters, Giselle and Iris. She agreed with DFPS's counsel that there was a "pattern" and that she had "a history" of going to jail while her children were in DFPS's care.

Mother testified that in the future, she "plan[ned] on making better choices." She believed that she had dealt with the reasons why she used drugs, she had received assistance in dealing with grief and past emotional abuse, and she knew that she did not "have to use to mask those emotions." Mother testified that she was not in the same position as she was when DFPS removed Jade and Anna from her care, stating that she does not "even know the person that [she] was before." She testified that she has no desire to use drugs ever again, and she was one hundred percent committed to doing the work necessary to stay sober.

DFPS presented evidence that Mother has a history of repeated drug use and incarceration dating back at least to the conservatorship case involving Jade. Mother admitted using methamphetamine, and she admitted getting into legal trouble when she used methamphetamine. Mother pleaded guilty to two charges for possession of methamphetamine during the pendency of this proceeding, and after being placed

_____

her late husband "were both cooperating with CPS to—to get the case closed, close the case, doing services."

on community supervision for these charges, she used methamphetamine again and was arrested. Mother was incarcerated for most of the underlying proceeding, and her release date from confinement was in March 2025. Although there is no evidence that Mother's drug use and incarceration directly harmed Anna, DFPS was not required to establish that Anna suffered actual harm. *See In re R.R.A.*, 687 S.W.3d at 278. Instead, a factfinder can reasonably find endangerment if "a pattern of parental behavior that presents a substantial risk of harm to the child" exists. *Id.* We conclude that such evidence is present in this case.

Moreover, although the trial court could properly consider Mother's testimony that she had made progress in understanding her triggers for using drugs and had committed to working to stay sober, the court could also consider that Mother had not yet completed a substance abuse rehabilitation program and had not demonstrated that she could remain drug-free outside of a jail setting. *See In re J.O.A.*, 283 S.W.3d at 346 (noting that while parent's recent improvements are "significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices"); *Jordan*, 325 S.W.3d at 732 (same).

We conclude that when considering all the evidence, the disputed evidence that a reasonable factfinder could not have credited in favor of the trial court's finding under subsection (E) is not so significant that the court could not reasonably

28

have formed a firm belief or conviction that the finding was true. *See In re A.B.*, 437 S.W.3d at 503. We therefore hold that factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights to Anna was warranted under subsection 161.001(b)(1)(E).

We overrule Mother's fourth issue.[10]

## C.     Sufficiency of Evidence to Support Best Interest Finding

### 1.     Governing Law on Best Interest

In addition to proving a predicate ground for termination, DFPS must also prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. TEX. FAM. CODE § 161.001(b)(2). A "strong presumption" exists that the best interest of the child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a presumption also exists that "the prompt and permanent placement of the child in a safe environment" is in the child's best interest. TEX. FAM. CODE § 263.307(a).

The best-interest inquiry "is child-centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d at 746 (quoting *In re A.C.*, 560 S.W.3d at 631). The Texas Supreme Court has identified several non-exclusive

---

[10]     Because we conclude that factually sufficient evidence supports the trial court's finding under subsection (E), we need not address Mother's third issue, in which she contends that legally and factually insufficient evidence supports the trial court's finding under subsection (O). *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

factors relevant to determining whether termination is in a child's best interest, including:

> (1)    the desires of the child;
>
> (2)    the child's emotional and physical needs now and in the future;
>
> (3)    the emotional and physical danger to the child now and in the future;
>
> (4)    the parenting abilities of the individuals seeking custody;
>
> (5)    the programs available to assist those individuals to promote the child's best interest;
>
> (6)    the plans for the child by those individuals or by the agency seeking custody;
>
> (7)    the stability of the home or proposed placement;
>
> (8)    the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and
>
> (9)    any excuse for the parent's acts or omissions.

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the statutory factors set out in Family Code section 263.307(b). *See* TEX. FAM. CODE § 263.307(b) (listing thirteen factors to consider in determining whether child's parents "are willing and able to provide the child with a safe environment"); *In re A.C.*, 560 S.W.3d at 631 n.29.

DFPS is not required to prove all the *Holley* factors as a condition precedent to termination of parental rights. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The *Holley* factors "are not exhaustive, no one factor is controlling, and a single factor may be adequate to support a finding that termination of the parent-child relationship

is in a child's best interest on a particular record." *In re A.J.D.-J.*, 667 S.W.3d 813, 822 (Tex. App.—Houston [1st Dist.] 2023, no pet.); *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Proof of acts or omissions relating to a predicate ground for termination does not relieve DFPS from proving that termination is in the child's best interest, "but the same evidence may be probative of both." *In re A.C.*, 560 S.W.3d at 631–32. The best-interest inquiry "may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

When evaluating best interest, a parent's past conduct is probative of the parent's future conduct. *In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). A factfinder may also infer that "past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent." *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

## 2. Analysis

Anna was not quite two years old at the time of trial, and she was therefore too young to articulate her desires about her placement. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with [their] parent." *In re N.J.H.*, 575 S.W.3d at 834 (quotation omitted).

Anna had lived with Mother for approximately four months of her life and with her foster family for approximately eighteen months. Anna was "doing great" in her foster placement. She was a "very social and joyful toddler," and she got along well with her six-year-old foster brother. She was "very bonded" to her foster father, and she referred to her foster mother as "mother." Anna's foster family hoped to adopt her.

Anna was "developmentally on track," and she had no special medical needs. She was, however, still a toddler at the time of trial, and she was completely dependent upon others for her care. Courts may consider a child's age, as well as any physical or mental vulnerabilities when making a best-interest determination. *In re J.M.T.*, 519 S.W.3d at 270.

DFPS has been involved with Mother and her family for several years, pre-dating Anna's birth. Concerns about drug use and domestic violence led to the conservatorship case involving Jade. Mother acknowledged that she used methamphetamine during that case, and she was incarcerated two or three times during that period. DFPS had been Jade's managing conservator for approximately four years at the time of the underlying trial. Mother also did not have custody of two of her other children—Giselle and Iris—who lived with their paternal grandmother. Mother had allowed her former mother-in-law to have custody of Giselle and Iris during the conservatorship case with Jade. The girls remained with

their grandmother after their father—Mother's husband—passed away unexpectedly in 2021. Mother was grieving and emotionally distraught, and she "lost [her] way" after her husband's death.

Mother's pattern of drug use and incarceration continued after Anna was born. She was arrested for possession of methamphetamine twice after Anna's birth, and she admitted using methamphetamine during the pendency of the termination proceeding. Mother had not participated in a substance abuse rehabilitation program, although she hoped to obtain a place in an inpatient program after her release from state jail in March 2025. "Parental drug abuse reflects poor judgment and may be a factor to consider in determining a child's best interest." *Id.* at 269. Moreover, evidence of Mother's past drug use supports an inference that she is at risk for continuing drug use, which is relevant to the stability and safety of her home, Anna's future emotional and physical needs, and future physical danger to Anna. *See id.*

DFPS also presented evidence that Mother did not have stable housing. Around the time of Anna's removal, Mother and Anna lived with Grandmother. In April 2023, Mother was arrested and incarcerated at the Brazoria County Jail, where she remained until mid-July 2023. She spent the next several months living with various friends and relatives. In December 2023, she stayed with a friend who was using methamphetamine, which led to Mother using methamphetamine again and another arrest for possession of a controlled substance. Mother had been incarcerated

33

since December 2023: first at the Brazoria County Jail until mid-June 2024, and then at a state jail facility, where she resided at the time of trial and was expected to remain until her release date in March 2025.

Mother acknowledged that she had not completed the requirements of her service plan. *See id.* at 269–70 (considering parent's failure to complete all tasks and services required by service plan as evidence supporting trial court's best-interest finding). Mother testified that she started taking parenting classes online before she was incarcerated in December 2023, and she eventually finished a parenting course while she was in the Brazoria County Jail. She had also met with a counselor two or three times while in jail. Mother testified that she had applied for admission into several programs while at the state jail facility, including domestic violence classes, substance abuse recovery, mental-health classes, and PTSD counseling. She was still awaiting approval to begin those programs.

As mentioned above, Mother hoped to enter an inpatient substance abuse treatment program upon her release from confinement. She did not have a commitment from a particular facility, and she did not know if she would be able to have Anna with her. Mother requested that DFPS continue as Anna's temporary managing conservator until she completed all her services, although she acknowledged that she did not know when that would be.

Mother agreed that she had made mistakes and that she had not been able to provide Anna with everything that she needed after Anna's removal from her care.[11] She testified that she had worked to gain insight into her reasons for using drugs, and she had also received assistance in processing her grief over her husband's death and in dealing with emotional abuse that she had suffered from her own father and in past relationships. She stated that she recognized that she had a problem with drug use, and she had started taking accountability for her mistakes and choices.

Although she had not completed most of her required services, Mother demonstrated a willingness to seek out services to improve her parenting abilities and her mental health. However, this evidence of a desire to improve, while positive, does not outweigh the evidence of Mother's pattern of using methamphetamine and engaging in criminal conduct that leads to incarceration and instability, which carries substantial risk to the health and safety of toddler-age Anna. *See In re J.O.A.*, 283 S.W.3d at 346 (noting that evidence of recent improvements does not conclusively negate probative value of parent's long history of drug use and "irresponsible choices"). As discussed above with respect to the trial court's subsection (E) finding, at the time of trial Mother had not yet participated in a substance abuse program, and

---

[11]     Mother testified that she had been properly caring for Anna before her removal. Living with Grandmother allowed her to rely on Grandmother for assistance and support, and she used WIC and a church-based program to provide Anna with food, clothes, and toys.

she had not demonstrated an ability to stay drug-free outside of jail. At the time of trial in August 2024, Mother still had seven months remaining of her period of confinement in state jail, and the time it would take for her to complete her services after her release was unknown.

Considering all the evidence, we conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of the trial court's best-interest finding is not so significant that the court could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in Anna's best interest. *See In re A.B.*, 437 S.W.3d at 503. We hold that factually sufficient evidence supports the trial court's best-interest finding.

We overrule Mother's fifth issue.

## Conclusion

We affirm the judgment of the trial court terminating Mother's parental rights to Anna.

David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.